**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

PATRICK McDONOUGH,                          )
                                            )
      Plaintiff,                         )
                                            )
v.                                          )          04-2697-STA-tmp
                                            )
MEMPHIS RADIOLOGICAL                        )
PROFESSIONAL CORPORATION and                )
MEDICAL ACCOUNTS RECEIVABLE                 )
MANAGEMENT d/b/a MED-ARM,                   )
                                            )
      Defendants.                        )

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Before the Court is Defendants' Motion for Summary Judgment (D.E. # 106) filed on

May 11, 2009.  Plaintiff has responded in opposition to Defendants' Motion.  For the reasons, set

forth below, the Motion is **GRANTED**.

**BACKGROUND**

The followings facts are not in dispute for purposes of this Motion unless otherwise

noted.[1]  MRPC is a Tennessee corporation composed of physician shareholders engaged in the

medical practice of radiology.  Defs.' Statement of Undisputed Facts ¶ 1.  Med-Arm is a separate

Tennessee corporation that operates as a medical services billing company.  *Id*. at ¶ 2.  Med-

---

[1] The Court finds that not all facts presented appear to be material to the Court's analysis
of Plaintiff's claims.  Therefore, those facts have not been included here.

1

Arm, an investment company for some of the shareholders of MRPC, bills medical services for a variety of clients including MRPC.  *Id*.  In 2003, Dr. Dale Hansen ("Dr. Hansen") was president of MRPC, and Dr. Frank Parks ("Dr. Parks") of MRPC was the president of Med-Arm.  *Id*. at ¶ 3.  MRPC and Med-Arm shared the same members of their respective Boards of Directors ("the Board") in 2003.  *Id*. at ¶ 4.  However, MRPC and Med-Arm kept separate financial books.  *Id*. at ¶ 5.

Prior to hiring Plaintiff, the Board was responsible for the business operations of MRPC including human resources.  *Id*. at ¶ 6.  George Dendrinos ("Dendrinos") was and is the CEO of Med-Arm and was responsible for client relations, the solicitation of new clients and insurance companies, and contract negotiations for different clients.  *Id*. at ¶ 7.  Janett Horne ("Horne") was and is the Chief Operating Officer of Med-Arm and has worked for Med-Arm since it was established in 1986.  *Id*. at ¶ 8.  Ki Chang ("Chang") was and is a systems analyst for Med-Arm.  *Id*. at ¶ 9.  Among other things, Chang was responsible for maintaining the physicians' home computers so that the physicians could do tele-radiology.  *Id*.  Dr. James Mitchum ("Dr. Mitchum") has been the president of MRPC since February 2008.  *Id*. at ¶ 10.

In 2003, MRPC's intent was to hire a business manager to help oversee some employees and relieve some of the administrative functions from the doctors so that the physician-owners could practice medicine and not run the business.  *Id*. at ¶ 11.  The Board approved and authorized Dr. Hansen to hire a business manager.  *Id*. at ¶ 12.  An MRPC physician referred Plaintiff to Dr. Hansen for the position, and MRPC hired Plaintiff in August 2003.  *Id*. at ¶¶ 13,14.  Plaintiff agreed to accept the title of Chief Executive Officer ("CEO").  *Id*. at ¶ 15.  The parties dispute whether this title was requested by Plaintiff or suggested by Dr. Hansen.  Plaintiff

was given an employment contract and was MRPC's only non-physician to have an employment contract. *Id*. at ¶ 19. The parties dispute whether Plaintiff's contract was simply for a one-year term or whether the contract also contained a provision for automatic renewals for successive one-year terms thereafter.

On August 3, 2003, Plaintiff commenced his employment with MRPC. Pl.'s Statement of Additional Undisputed Facts ¶ 127. The parties entered into an employment agreement employing Plaintiff as CEO of MRPC. *Id*. Dr. Hansen told Plaintiff that he was being hired to address a need for experienced professional management and to oversee the corporate offices, administrative offices, and billing practices. *Id*. Dr. Hansen made it clear to Plaintiff that there was a need for professionalism, systems and software evaluation, staff evaluation, and various needs pertaining to the billing company for which Plaintiff would be responsible. *Id*. Dr. Hansen told Plaintiff that there were "billing and operational issues that they (the Board) felt someone needed to come in and kind of get their hands around and kind of bring some structure and organization to the practice and to the billing company." *Id*. at ¶ 128. The parties dispute whether Plaintiff reported directly to the Board or whether he reported to Dr. Hansen with "dotted line reporting" to the Board. Plaintiff also had oversight of the billing practice at Med-Arm. Defendants' Statement of Undisputed Facts ¶ 22.

Non-physician employees of MRPC have not in the past had contracts providing for merit or distribution bonuses. *Id*. at ¶ 23. MRPC physician shareholders are eligible for a bonus that is actually a distribution of revenue to the shareholders. *Id*. at ¶ 24. In 2003-2004, there was a merit bonus of about one thousand dollars per month for the physicians, which they received

3

for showing up for work and for not creating problems for the organization.  *Id.* at ¶ 25.[2]  The distribution of revenue bonuses is within the discretion of the Board.  *Id.* at ¶ 26.

*Memphis Light Gas & Water Billing Issues*

In 2002, prior to the hiring of Plaintiff, MRPC and Med-Arm became aware of overpayments from Memphis Light Gas & Water (MLGW), a municipal utility, to MRPC for the provision of health care services.  *Id.* at ¶ 27.  The parties dispute whether Plaintiff ever alleged that MRPC had overcharged MLGW.  As COO of Med-Arm, Horne started an analysis/audit and reconciliation of the MLGW account in 2002; the audit and reconciliation took some time due to the number of claims involved and the fact that claims were spread over a period of several years.  *Id.* at ¶ 30.  After Plaintiff was hired, Dr. Hansen told Plaintiff about the MLGW overpayment issue and tasked Plaintiff with looking into the matter to "see what you can figure out."  *Id.* at ¶ 31.  The parties do not dispute that the MLGW issue was created by Med-Arm's billing software, which did not detect whether a bill had been overpaid or underpaid.  *Id.* at ¶ 32. The parties dispute though whether Dendrinos told Plaintiff about the software issue or whether Plaintiff accepted Dendrinos' explanation.  Plaintiff did not participate in the reconciliation of these overpayments; however, Dendrinos did review the MLGW audit with Plaintiff.  *Id.* at ¶ 33.

Dendrinos and Plaintiff disagreed with each other as to the amount to be paid to MLGW.

---

[2] Plaintiff disputes this fact on the basis that Defendants refused to divulge it during discovery and resisted Plaintiff's motion to compel.  However, it appears that this assertion is based upon the deposition testimony of Dr. Parks.  The Court finds that Plaintiff's objection to this statement is without merit.

*Id*. at ¶ 34.  The parties disagree over how Plaintiff and Dendrinos proposed to resolve the matter with MLGW.  Plaintiff claims that he wanted to write MLGW a check for amounts owed from 2000 to 2002; whereas, Dendrinos insisted on verifying that the amounts MLGW claimed were, in fact, accurate.  According to Plaintiff, he spoke with physicians, primarily Dr. Hansen and Dr. Routt, about the MLGW billing issue.  *Id*. at ¶ 36.  Plaintiff states that he consistently conveyed the message that "we've got to determine why we were overpaid, and more importantly why are we holding the funds we know are overpayments."  *Id*. at ¶ 36.   In these conversations, Plaintiff expressed his concerns about "holding money from a public utility in a market where many people didn't have the ability to pay their electric bill, and it seemed to me to be incredibly inappropriate that we would maintain these funds knowing they were overpayments."  *Id*. at ¶ 38.

In 2003, prior to Plaintiff's termination, Defendants issued a refund check to MLGW in the amount of $212,000.00 to reconcile the overpayments. *Id*. at ¶ 40.  Billings to MLGW were only one-fifth of 1% of MRPC's collectibles.  *Id*. at ¶ 41.


### *Semmes-Murphey Reassignment Issues*

In 2002, Semmes-Murphey, a neurosurgery medical practice, entered into a professional agreement with MRPC to interpret MRI exams conducted in the Semmes-Murphey facility located in Methodist Hospital's office building.  *Id*. at ¶ 42.  Under the agreement, MRPC was to interpret the films, draft opinions, dictate summaries of findings, have the summaries transcribed, and provide hard-copy reports.  *Id*.  Semmes-Murphey was to bill for MRPC's services and then pay MRPC.  *Id*. at ¶ 43.

At the end of 2002 or early in 2003 and prior to Plaintiff's hiring, MRPC learned that the terms of its Semmes-Murphey contract might present a "reassignment" problem under Medicare regulations. *Id*. at ¶ 44. According to Defendant, the issue involved where x-ray films were read and Semmes-Murphey's billing of the readings. *Id*. at ¶ 45. The films were read on the Methodist University campus where Semmes-Murphey and MRPC each had offices. *Id*. at ¶ 46. Those offices were in separate buildings connected by a hallway. *Id*. at ¶ 47. According to Plaintiff, he asked Dendrinos to provide the Semmes-Murphey file, but Dendrinos took about 30 days to produce it. Pl.'s Statement of Additional Undisputed Facts ¶ 131. The filed contained the Semmes-Murphey agreement under which MRPC was to provide Semmes-Murphey professional radiological interpretation of MRI studies in return for Semmes-Murphey paying MRPC 18% of the 95% net MRI collection. *Id*. The MRPC physicians were interpreting the film at MRPC space in Methodist Hospital, not at a Semmes-Murphey facility where the film was actually made. *Id*. According to Plaintiff, Medicare law permits a patient to assign benefits payable under Medicare Part B to a physician, 42 U.S.C. §§ 1395g, 1395V(b)(6), 42 C.F.R. §§ 424.70-424.90, but that physician may not reassign those benefits to another physician except in very narrow circumstances. 42 C.F.R. § 424.80. *Id*.

The parties dispute whether Charles Key, Semmes-Murphey's attorney, characterized the reassignment issue as a major problem. MRPC tried to address the reassignment issue with Semmes-Murphey numerous times by suggesting changes to work arrangement and by suggesting a separate billing arrangement, but Semmes-Murphey refused to make any changes to the service agreement and the methods being employed by MRPC. Defs.' Statement of Undisputed Facts ¶ 50.

Within days of Plaintiff's hire, Dr. Parks asked Plaintiff to look into the reassignment issue.  *Id*. at ¶ 58.  Plaintiff had no prior knowledge of the reassignment issue; Dr. Parks brought the matter to his attention.  *Id*. at ¶ 59.  Dr. Parks had been aware of the reassignment issue since November 2002.  *Id*. at ¶ 53.  Dr. Parks told Plaintiff that he had concerns about whether the billing arrangement with Semmes-Murphey complied with the Medicare regulations pertaining to on-site reading of films.  *Id*. at ¶ 60.  Dr. Parks had discussed  this potential billing issue with others before Plaintiff was hired, "so it wasn't like it was unknown to everybody."  *Id*. at ¶ 61.[3] MRPC discussed the Semmes-Murphey Medicare reassignment issue with Plaintiff after he was hired and tasked Plaintiff with making another attempt to resolve the issue.  *Id*. at ¶ 62.

According to Plaintiff, the reassignment issue with Semmes-Murphey was "a hot topic for about the first 30 to 45 days I was there . . ." and the physicians in the practice would ask Plaintiff for updates on what he had found out on the matter.  *Id*. at ¶ 63.  Dr. Hansen authorized, and MRPC paid for, legal opinions to assess whether an issue existed with regard to the billing arrangement and the Medicare regulations.  *Id*. at ¶ 64.  Prior to Plaintiff's hire, Defendants had already obtained legal opinions concerning the Semmes-Murphey agreement and its compliance with the Medicare regulations.  *Id*. at ¶ 65.  For example, the Board authorized and Dendrinos

---

[3] Over time, Dr. Parks had addressed the matter with the head of Semmes-Murphey who stated that the arrangement with MRPC was proper and that there was no reason to change the arrangement.  *Id*. at ¶ 51.  Med-Arm was not involved in the billing for the Semmes-Murphey work.  *Id*. at ¶ 52.  Dr. Parks also spoke to Dr. Hansen, Dr. Routt, and Dendrinos about his concerns.  *Id*. at ¶ 54.  According to Dr. Parks, the head of Semmes-Murphey, Dendrinos, Dr. Routt, and eventually Plaintiff all told him at various times that legal opinions described the reassignment problem as a "technical violation" but advised that revisions to the regulations negated the issue.  Plaintiff disputes that he ever advised Dr. Parks that there was only a technical violation.  *Id*. at ¶ 57.  Rather Plaintiff claims that he suggested to the Board and Dr. Hansen that they obtain an advisory opinion on the issue from Medicare.

obtained a legal opinion on the reassignment issue in December 2002. *Id*. at ¶ 48. Plaintiff claims that the reassignment issue was brought up in Board meetings and group meetings throughout his brief tenure. *Id*. at ¶ 67. Plaintiff claims that he informed the physicians that "we have a problem" or a "significant problem" and said "Doctors, we need to fix this. Doctors, we need to talk to Semmes-Murphey." *Id*. at ¶ 66. According to Plaintiff, he conveyed a "consistent message to everybody, "we've got to fix this." *Id*. at ¶ 68.

However, Defendants claim that Dr. Parks followed up with Plaintiff on more than one occasion about the reassignment issue, and Plaintiff advised that he had not done anything. *Id*. at ¶ 69. Plaintiff claims that he informed Dr. Parks that he was on to something and that the agreement was illegal and that it needed to be corrected. Several solutions were considered. One solution to the Medicare reassignment issue was that MRPC could have read the MRI films at Semmes-Murphey where the MRIs had been made. *Id*. at ¶ 70. Reading the films at the Semmes-Murphey location was not feasible due to the lack of a sufficient number of view boxes, the need to consult with other radiologists, and the fact that patient histories were located at Methodist Hospital (and these were needed because the Semmes-Murphey patients were predominately brain-tumor patients and comparing present films to past films was important to determine whether a tumor had grown). *Id*. at ¶ 71. Another solution was for MRPC to bill separately for reading the film for Semmes Murphey; however, Semmes-Murphey rejected that solution. *Id*. at ¶ 72.

On behalf of MRPC, Plaintiff obtained a third legal opinion letter, dated January 6, 2004, from Jay Barker, Esq. ("Barker"). *Id*. at ¶ 73. Barker stated that Medicare will warn a party where there is a reassignment violation before imposing any sanctions. *Id*. Moreover, Barker

informed Plaintiff that the regulations had changed in December 2003 to allow such global-billing arrangements.  *Id*. at ¶ 74.  Plaintiff was aware of this change and made the physicians aware of the new regulations as well.  *Id*.

MRPC terminated the Semmes-Murphey agreement in April 2004 and stopped providing services in May 2004.  *Id*. at ¶ 75.

*Other Billing Problems*

Plaintiff acknowledges that Dr. Hansen advised him of the issues with MLGW, Semmes-Murphey, and some other billing concerns (the upcoding/overcoding question and the modifier 26 question) at the time of his hire, specifically telling Plaintiff, "Find out what they are, Patrick, get your hand around them and report back to us"; Plaintiff had no firsthand knowledge of coding issues.  *Id*. at ¶ 78.

According to Dr. Parks, MRPC used a billing code known as modifier 26 which pertained to the payment of the professional component of a global service.  *Id*. at ¶ 77.  MRPC did not omit modifier 26's from its bills but embedded them in the billing where they should be. *Id*.  Plaintiff disputes that Dr. Park has any personal knowledge of modifier 26 being embedded in the actual billing.  According to Plaintiff, Dr. Park's opinion is based on representations made by Dendrinos and Horne.

In another billing issue, Plaintiff claims that he asked Dr. Hansen whether having the doctors re-dictate charts would create upcoding/overcoding issues.  *Id*. at ¶ 79.  Dr. Hansen stated that re-dictation may be necessary if the report did not include complete information such as where the doctor failed to dictate the complete examination or failed to indicate how many

views were taken.  *Id.* at ¶ 80.  Plaintiff admits that the re-dictations may have been used merely to specify whether one or two films had been taken, for purposes of clarity, or where there may have been a clinical issue.  *Id.* at ¶ 81.  Dr. Hansen told Plaintiff that he would look into the re-dictation issue further.  *Id.* at ¶ 82.  Plaintiff stated that he trusted Dr. Hansen and that if Plaintiff raised a concern with Dr. Hansen, he believed Dr. Hansen would take the concern to the next level.  *Id.*  Plaintiff adds that although Dr. Hansen always listened to him, Dr. Hansen "rarely took a strong position."

Plaintiff also alleges that he witnessed "stacks of charts" being signed by physicians who had not done the dictation or had not seen the patient.  *Id.* at ¶ 83.  The parties dispute whether it was legal prior to 2003-2004 for a physician to sign his partner's reports.

With respect to residents, MRPC physicians worked collaboratively with the residents who were under the direct supervision of the physicians. *Id.* at ¶ 85.  An MRPC physician would sit down with a resident who either dictated the chart or watched the physician dictate the chart. *Id.* at ¶ 86.  Residents did not work without direct supervision by a physician.  *Id.* at ¶ 87. Physicians did not sign residents' reports that were not supervised.  *Id.* at ¶ 88.  According to Plaintiff, he also discovered that residents were treating patients without doctor supervision. There were also billing issues concerning the residents.  As he walked through the radiology department at various times, Plaintiff observed that residents were unsupervised.  He had also heard comments about from others regarding situations such as doctors leaving invasive procedures with techs in the room.  Plaintiff claims that he reported the residency issues to Drs.

10

Routt and Hansen.[4]  Plaintiff also alleges that he made Drs. Routt and Hansen aware that he felt

that some residents were not being properly supervised and about issues concerning physicians

signing patient charts.  *Id*. at ¶ 89.  Both doctors told Plaintiff they would follow up on this.  *Id*.


*Plaintiff's Termination*

Dr. Parks initially informed the Board that there were serious issues with Plaintiff's

behavior toward Med-Arm employees,  specifically Dendrinos and Horne.  *Id*. at ¶ 90.  After Dr.

Parks' report, the Board recognized that it needed to take action to confirm the allegations about

Plaintiff's behavior.  *Id*. at ¶ 91.  The Board set up a fact-finding committee composed of Drs.

Buechner and Mitchum to conduct interviews and investigate the allegations.  *Id*. at ¶ 92.  Dr.

Hansen also participated in the interviews at Med-Arm.  *Id*.

During Horne's interview, she cried and became emotionally upset as she detailed an

incident with Plaintiff.  *Id*. at ¶ 93.  According to Horne, Plaintiff had verbally abused her with

foul language.  *Id*.  Horne indicated that the situation was serious and would undermine the

continued success of Med-Arm.  *Id*.  While Plaintiff denies that there was ever a verbal

altercation with Horne, it is undisputed that Plaintiff had provided alcohol to a Med-Arm

employee on Med-Arm property on at least one occasion.  *Id*. at ¶ 94.  When Horne became

aware of this, she advised Plaintiff that it was against Med-Arm policy to provide alcohol to an

employee and to hug an employee in front of other employees.  *Id*. at ¶ 95.  Horne was

concerned that such displays gave the appearance of favoritism.  *Id*. at ¶ 96.  Plaintiff states that

---

[4] While pointing out that some of Plaintiff's attested facts are hearsay, Defendants do not
dispute this assertion for purposes of summary judgment.

he apologized to Horne and the Med-Arm employees who might have been offended by his actions. However, Horne told the Board that Plaintiff responded to her by saying that he did not care about the "f****** Med-Arm policy" or "the g**d***handbook." *Id*. at ¶ 97. Plaintiff denies this allegation. Horne testified that she had never been spoken to in the manner used by Plaintiff. *Id*. at ¶ 99.

After the investigation, Drs. Buechner and Mitchum found Horne credible and trustworthy. *Id*. at ¶ 114. Their investigation confirmed that Plaintiff had verbally abused Horne by using the G-D word and the F word, which was unacceptable to MRPC. *Id*. at ¶ 107. Plaintiff also had conflicts with Dendrinos and Chang, Med-Arm's systems analyst. *Id*. at ¶ 102. Plaintiff denies that he used that language with Horne or ever had problems with Chang.

It appears to be undisputed that Plaintiff was never questioned about the incident or that the Board made the determination that if Plaintiff was not dismissed, then Dendrinos and Horne would resign. The interviews with Horne and Dendrinos convinced Dr. Buechner that Plaintiff's conduct was an imminent threat to the success of Med-Arm. *Id*. at ¶ 101. Dr. Buechner believed that the Board needed to terminate Plaintiff, and nothing Plaintiff could have said would have altered his opinion. *Id*. at ¶ 110. Likewise, Dr. Mitchum had decided to recommend termination. *Id*. at ¶ 112. Dr. Mitchum considered Horne a valuable management employee whom he trusted more than his accountant. *Id*. Dr. Mitchum also believed that Horne intended to leave Med-Arm if the situation was not addressed. *Id*. In Dr. Mitchum's opinion, there was no reason not to believe Dendrinos and Horne who had been responsible for the success of Med-Arm as opposed to Plaintiff who brought nothing to the table. *Id*. at ¶ 113. Drs. Mitchum and Buechner testified that they were unaware and remain unaware of Plaintiff ever having an

12

opinion on the Semmes-Murphey reassignment issue. *Id.* at ¶ 76.

Drs. Mitchum and Buechner reported to the Board that the relationship between Plaintiff and Med-Arm management was irreparably damaged due to the broken trust and the obscenities used toward Horne. *Id.* at ¶ 115. The Board agreed that Horne and Dendrinos were likely to leave if things did not change. *Id.* at ¶ 106. Horne and Dendrinos were key employees that had helped to build a very successful organization at Med-Arm. *Id.* at ¶ 100. MRPC could not and did not want Med-Arm to lose Dendrinos or Horne or Chang. *Id.* at ¶ 108. The Board concluded then that Plaintiff was not a good fit for MRPC and that he failed to meet job expectations. *Id.* at ¶ 111. Based upon the recommendation made to the Board by Drs. Mitchum and Buechner, the Board voted unanimously to terminate Plaintiff. *Id.* at ¶ 116. In the final analysis, it was a choice between Plaintiff and Dendrinos and Horne who together had more than 40-years of service successfully running Med-Arm. *Id.* at ¶ 117. Moreover, Horne was a "critical" person at Med-Arm, the "one person in that organization that we would not want to lose." *Id.*

On or about February 10, 2004, Dr. Hansen advised Plaintiff of his termination. *Id.* at ¶ 118. Dr. Hansen initially asked Plaintiff to resign because it was not working out, and Plaintiff requested 24 hours to decide. *Id.* at ¶ 119. Plaintiff notified Dr. Hansen the following day that he would not resign but would rather be terminated. *Id.* The Board chose to refer to the "without cause" termination provision in Plaintiff's contract because it wanted to pay out the remainder of Plaintiff's contract and have an amicable separation. *Id.* at ¶ 120.

Shortly after Plaintiff's employment was terminated, MRPC became aware that some confidential documents were missing. *Id.* at ¶ 121. In his second deposition on April 29, 2009, Dr. Hansen testified that he had asked Plaintiff after the termination whether Plaintiff still had

any company documents.  *Id.* at ¶ 122.  Plaintiff had responded that he did not.  *Id.*  Therefore,

Plaintiff's action of retaining these documents was not an innocent or inadvertent mistake.  *Id.*

Dr. Hansen testified that he would not have re-hired Plaintiff based on this discovery.  *Id.*

Plaintiff disputes that Dr. Hansen ever asked him whether he still had company documents after

his termination.  Nevertheless, Plaintiff admitted in his January 12, 2009 deposition to taking and

keeping confidential MRPC records.  *Id.* at ¶ 123.  Plaintiff states that he did not remove the

documents after his termination but that they were already in his possession at the time he was

dismissed.

There was no testimony by Plaintiff reflecting that he had threatened to report billing

issues to an outside entity, nor was there any testimony by Plaintiff that he had suggested or

otherwise indicated to Defendants that he would be pursuing these issues further through False

Claims Act litigation (Plaintiff conceded that all of his statements to the doctors were covered in

his deposition).  *Id.* at ¶ 124.


## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a

judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that
there is no genuine issue as to any material fact and that the moving party is entitled
to a judgment as a matter of law.[5]

In reviewing a motion for summary judgment, the evidence must be viewed in the light most

_____

[5] Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

14

favorable to the nonmoving party.[6]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[7]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[8]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[9]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[10]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[11]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [the nonmoving party's] asserted causes of action."[12]  Finally, the "judge may not make credibility determinations or weigh the evidence."[13]

---

[6] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[7] *Celotex*, 477 U.S. at 324.

[8] *Matsushita*, 475 U.S. at 586.

[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[10] *Id*. at 251-52 (1989).

[11] *Celotex*, 477 U.S. at 322.

[12] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[13] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[14]

## ANALYSIS

Plaintiff has alleged a claim of retaliation pursuant to the federal False Claims Act as well as claims of retaliatory discharge pursuant to the Tennessee Public Protection Act ("TPPA") and Tennessee common law.

The Court is presented with an unusual situation with regard to Plaintiff's False Claims Act claim. In response to Defendants' Motion, Plaintiff failed to address any of Defendants' arguments with respect to the federal False Claims Act. Then after briefing on the instant Motion was complete, Defendants filed a Notice indicating that "Plaintiff notified defense counsel on July 13, 2009, that Plaintiff has abandoned his claim under the Federal False Claims Act and will not pursue the same."[15] In effect, Plaintiff had voluntarily dismissed the claim. Defendants have since filed a motion for involuntary dismissal of Plaintiff's federal claim.[16] According to Defendants' motion to dismiss, Plaintiff has stated that he does not intend to file a notice of voluntary dismissal pursuant to Rule 41(a). Defendants ask the Court to enter an order of involuntary dismissal for Plaintiff's failure to prosecute. Based on the Notice and Plaintiff's failure to respond to Defendant argument on summary judgment as to the False Claims Act, the

---

[14] Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 322 (1986).

[15] Notice of Plaintiff's Abandonment of Federal False Claims Act Claim, July 13, 2009.

[16] Def.'s Mot. to Dismiss, July 14, 2009.

Court holds that Defendant is entitled to summary judgment as to Plaintiff's False Claims Act allegation. Therefore, Defendant's Motion is granted as to Plaintiff's federal claim.

Having dismissed the claim over which the Court had original jurisdiction, Plaintiff's state law claims of retaliatory discharge under the TPPA and Tennessee common law remain. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."[17] It is settled law that the district court may exercise jurisdiction over a pendent state law claim, even after the basis for removal to federal court has been eliminated, if recommended by a careful consideration of factors such as judicial economy, convenience, fairness, and comity.[18] In light of the amount of time this matter has been pending before this Court and the fact that the case has proceeded to the summary judgment stage and is otherwise ready for trial, the Court finds that it would be more efficient, convenient and fair to the parties to continue to exercise supplemental jurisdiction over Plaintiff's state law claims. Defendants' Motion seeks summary judgment as to both claims. The Court will analyze each claim separately.

## I.    *TPPA Claim*

The Tennessee Public Protection Act ("TPPA") protects employees from termination "solely for refusing to participate in, or for refusing to remain silent about, illegal activities."[19]

---

[17] 28 U.S.C.A. § 1367(a).

[18] *See Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

[19] Tenn.Code Ann. § 50-1-304(a).

The Court observed in a previous case that "[t]he objective of this act is to remove an employee from a position of having to choose between reporting workplace illegalities to the proper authorities and remaining employed."[20]  The TPPA is commonly referred to as the "whistleblower" statute and "gives an employee freedom to speak out about illegalities in the workplace even though it is 'axiomatic that an employer who is engaged in illegal activity does not want that activity reported to those officials who are responsible for enforcing the law.'"[21]

In order to establish a TPPA claim, a plaintiff must prove each of the following elements: (1) the plaintiff's status as an employee of the defendant; (2) the plaintiff's refusal to participate in, or to remain silent about, illegal activities; (3) the employer's discharge of the employee; and (4) an exclusive causal relationship between the plaintiff's refusal to participate in or remain silent about illegal activities and the employer's termination of the employee.[22]  After the employee has established a prima facie case of retaliatory discharge, the burden shifts to the employer to assert a "legitimate, non-pretextual reason for the employee's discharge."[23]  If the employer meets its burden, the burden shifts back to the employee to prove that the employer's explanation is pretext.[24]  In proving pretext, the employee "must present specific admissible facts, which realistically challenge the defendant's stated reasons."[25]

---

[20] *Wooley v. Madison County, Tennessee*, 209 F. Supp. 2d 836, 844 (W.D. Tenn. 2002) (J. Gibbons) (citations omitted).

[21] *Id.* (quoting *Mason v. Seaton*, 942 S.W.2d 470, 475 (Tenn. 1997)).

[22] *Wooley*, 209 F. Supp. 2d at 844.

[23] *Id.* at 845.

[24] *Id.*

[25] *Id.*

With respect to the second element, the Tennessee Court of Appeals has largely defined what qualifies as a "plaintiff's refusal to participate in, or to remain silent about, illegal activities" for purposes of the TPPA.  A whistleblower must show more than that the employer has violated a law or regulation.[26]  The employee must show that his or her "efforts to bring to light an illegal or unsafe practice furthered an important public policy interest" rather than the employee's personal interest.[27]  The Tennessee court has held that an employee's report of "a serious infraction of the law to either company management or law enforcement officials" will qualify for protection under the Act.[28]  While it is not necessary to report illegal activities directly to law or regulatory enforcement officials, a whistleblower must "make a report to some entity other than the person or persons who are engaging in the allegedly illegal activities."[29]  Where the "offending supervisor" and company management are the same person(s), an employee's report of illegalities is likewise protected under the Act.[30]  However, the Tennessee court has recently acknowledged that the question of "whether a statutory cause of action is available to a plaintiff whose employment was terminated solely for refusing to participate in an illegal activity where the plaintiff did not report that activity" remains open under Tennessee

---

[26] *Collins v. AmSouth Bank*, 241 S.W.3d 879, 885 (Tenn. Ct. App. 2007) (citing *Guy v. Mut. of Omaha Ins. Co.,* 79 S.W.3d 528, 538 (Tenn. 2002); *Franklin v. Swift Transp. Co., Inc.,* 210 S.W.3d 521, 531 (Tenn. Ct. App. 2006).

[27] *Collins*, 241 S.W.3d at 885 (citations omitted).

[28] *Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 371 (Tenn. Ct. App. 2005).

[29] *Id*.

[30] *Id*. at 371 n. 1.

law.[31]

Defendants argue that Plaintiff's TPPA claim fails because Plaintiff cannot show that his alleged whistleblowing was the "sole" cause of his termination. Defendants contend that Plaintiff was actually terminated for his encounter with Horne, which in turn created a threat of losing both Horne and Dendrinos because they refused to continue working under Plaintiff. The Board made the determination that Horne's account was credible and more importantly that, given the choice between retaining Plaintiff and retaining Horne and Dendrinos, Horne and Dendrinos were more valuable to the company. Both were long-time, key employees that had built Med-Arm into a successful business. For these reasons, Defendants argue that Plaintiff cannot make out his claim for retaliation under the TPPA.

Plaintiff argues in response that summary judgment is inappropriate as to this claim because there exist disputed issues of material fact. Plaintiff denies that he ever used obscene language with Horne or that the incident happened at all. According to Plaintiff, there are multiple, inconsistent accounts of what happened casting more doubt on Horne's credibility. Plaintiff contends that Horne's story only came out after Plaintiff had spoken out about the illegal billing activities occurring at Med-Arm. Defendants further failed to interview Plaintiff about the incident to get his response to Horne's accusation. Instead Defendants accepted Horne's story and failed to act impartially in dealing with the situation for fear that they might damage their investment in Med-Arm. Defendants have also vacillated on what the reasons for Plaintiff's termination were first stating that Defendant was terminated without cause and with

---

[31] *Gossett v. Tractor Supply Co., Inc.*, 2009 WL 528924, *7 (Tenn. Ct. App. Mar. 2, 2009) (opining that the issue "must be left for another day").

pay.  Now Defendants claim that they terminated Plaintiff because of Horne's allegations.  All of these facts suggest pretext.

In this case, the Court holds that Plaintiff cannot make out his prima facie case of retaliation under the TPPA.  First, Plaintiff cannot establish that he refused to participate in, or to remain silent about, illegal activities.  Plaintiff did not "report" the illegal activities occurring at MRPC because Plaintiff was not the whistleblower and did not originate a report of illegalities to the Board.  Upon his hiring, Dr. Hansen informed Plaintiff of the irregularities regarding MLGW and Semmes-Murphey and asked him to investigate and correct them as part of his duties as the CEO of MRPC.  In a strict sense, it cannot be said then that Plaintiff  "reported" any illegal billing practices because the practices occurred prior to his hiring and more importantly the Board was already aware of them.  It is true that the full extent of the problems may have been unknown to the Board.  There also appears to have been differences of opinion within the company about the amount due MLGW and the legality of the reassignment issue with respect to Semmes-Murphey.   If nothing else, the evidence raises questions of fact about the billing practices at Med-Arm.  However, the undisputed evidence further shows that Plaintiff was hired in part to correct the problems, "to get his hands around" these matters.  In short, the whistle as to these issues had already been blown prior to Plaintiff's arrival.  Therefore, Plaintiff cannot prove this element of his case.[32]

_____

[32] There is also no authority for permitting the CEO of a company to avail himself of the TPPA where the CEO reported illegal company activities to a board of directors.  In this case Plaintiff was the chief executive of the company and as noted had the duty to oversee billing practices and accounting for the firm.  It is undisputed that Plaintiff was hired in part to correct ongoing billing problems.  The Board through Dr. Hansen was already aware of the questionable nature of the practices and wanted Plaintiff to correct the issues.  The Tennessee court has never considered whether a plaintiff who was himself the chief executive officer would qualify as a

Furthermore, even if Plaintiff could show that he engaged in protected activity, the Court holds that Plaintiff cannot establish the fourth element of the TPPA claim, that his position on the billing issues was the sole reason for his termination or that Defendant's reasons for dismissing Plaintiff were pretextual.  In this case, Plaintiff has alleged that he was terminated solely for his whistleblowing activities.  However, the undisputed evidence shows that Plaintiff was terminated in response to an accusation against him and the threat by two key employees that they would resign if Plaintiff was not dismissed.  Plaintiff has adduced no evidence from which a reasonable juror could conclude that his protected activity was the sole or exclusive cause of his termination.  As a matter of law, then Plaintiff has failed to establish his prima facie case under the TPPA.[33]

Generally, in cases alleging retaliation, the Court does not reach the issue of pretext

---

whistleblower under the statute for reporting illegality to a board of directors.  In *Chism v. Mid-South Milling Co., Inc.*,762 S.W.2d 552 (Tenn. 1988), the Tennessee Supreme Court did uphold the lower court's dismissal of a complaint for common law retaliatory discharge where the plaintiff was the vice-president of finance/secretary-treasurer of the corporation.  The plaintiff in *Chism* alleged that he was dismissed for bringing to the attention of the corporate president accounting irregularities that occurred prior to the plaintiff's hiring and which violated IRS regulations.  The Tennessee Supreme Court held that the complaint failed to state a claim because plaintiff had not alleged that he was personally responsible for preparing tax documents or would incur personal liability for the reported violations.  While *Chism* presents a situation more analogous to the facts of the case at bar, the Court still does not believe that *Chism*, a case involving the common law, resolves the issue of whether a CEO can avail him- or herself of the protections of the TPPA.

[33] *Mehr v. Starwood Hotels & Resorts Worldwide, Inc.*, 72 Fed. Appx. 276, 284 (6th Cir. 2003) (upholding grant of summary judgment to employer on plaintiff's TPPA claim where plaintiff could not show any causal connection); *Spurlock v. Peterbilt Motors Co., Inc.*, 58 Fed. Appx. 630, 632 (6th Cir. 2003) (construing TPPA retaliation); *Caruso v. St. Jude Children's Research Hospital, Inc.*, 215 F. Supp. 2d 930, 937-38 (W.D. Tenn. 2002).

unless and until the plaintiff has satisfied the elements of a prima facie case.[34]  Even if Plaintiff

had been able to establish his prima facie case, Defendants have offered a legitimate, non-

discriminatory reason for Plaintiff's dismissal, the incident involving Horne.  "An employer may

rebut the fourth element of a plaintiff's prima facie case by providing a legitimate reason for the

employee's discharge."[35]  The burden then shifts to Plaintiff to establish that Defendants'

proffered reason was pretextual.  To establish pretext, the employee "must present specific

admissible facts, which realistically challenge the defendant's stated reasons."  An employee

cannot simply rely on his own conclusory statements or subjective interpretation of events.[36]

The Tennessee courts have followed the "honest belief rule" meaning that "as long as an

employer has an honest belief in its proffered reason for discharging an employee, the employee

cannot establish that the reason was pretextual simply because it is ultimately shown to be

incorrect."[37]  In this case, Plaintiff has adduced no evidence to show that Defendants did not

have an honest belief that Horne's allegations were true and that Horne and Dendrinos would

resign if Defendants retained Plaintiff.  Plaintiff argues that he has adduced evidence to create a

question of fact about whether the incident with Horne occurred as Horne relates it.  However,

---

[34] *Policastro v. Northwest Airlines, Inc.,* 297 F.3d 535, 540 (6th Cir. 2002) (a plaintiff's "failure to establish a prima facie case precludes us from reaching the questions of whether [the employer] had a legitimate, non-discriminatory reason for the reassignment and whether that reason was actually a pretext.").

[35] *Rowell v. Madison County, Tenn.*, 2009 WL 1918078, *10 (W.D. Tenn. Jul. 2, 2009) (citing *Guy v. Mut. of Omaha Ins. Co.,* 79 S.W.3d 528, 537 (Tenn.2002)).

[36] *Hill v. Perrigo of Tennessee*, 2001 WL 694479, *7 (Tenn. Ct. App. 2001).

[37] *Hubrig v. Lockheed Martin Energy Systems, Inc.*, 1998 WL 240128, *8 (Tenn. Ct. App. 1998) (citations omitted) ("It is always the employer's honestly held beliefs that control.").  *See also Majewski v. Automatic Data Processing, Inc.,* 274 F.3d 1106, 1117 (6th Cir. 2001).

this issue is not relevant to show pretext in this case.  Although Defendants' decision not to

interview Plaintiff was questionable, the evidence shows that the physicians had a long-standing

relationship and trust with Horne.  More importantly, the Board had concluded that there was a

fundamental rift between Plaintiff on the one hand and Horne and Dendrinos on the other.  In

light of what the Board felt was an ultimatum from Horne and Dendrinos, the Board voted

unanimously to terminate Plaintiff.  Plaintiff has failed to show that the Board terminated him for

any other reason or that they did not have a honest belief in their stated reason.  Therefore, the

Court finds that Defendants are entitled to summary judgment as to Plaintiff's TPPA claim.


## II.  Common Law Retaliation

Prior to the enactment of the TPPA, Tennessee common law also provided a cause of

action for retaliatory discharge.  In order to state a claim for common law retaliatory discharge, a

plaintiff must establish the following: (1) an employment at-will relationship; (2) a clear

declaration of public policy which imposes duties upon the employee or employer; and (3)

discharge of the employee where his refusal to violate those duties is a substantial factor in his

termination.[38]  Due to the similarities of the statutory and common law causes of action, courts

have noted that the two claims are "cumulative" and involve a similar analysis.[39]

Defendants argue that Plaintiff cannot make out his common law claim for retaliatory

---

[38] *Crews v. Buckman Laboratories Intern., Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002).  *See also Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716-17 (Tenn. 1997); *Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d 822, 825 (Tenn. 1994); *Anderson v. Standard Register Co.,* 857 S.W.2d 555, 558 (Tenn. 1993); *Chism v. Mid-South Milling Co.,* 762 S.W.2d 552, 556 (Tenn. 1988).

[39] *Wooley*, 209 F. Supp. 2d at 845.

discharge.  Defendants contend that this cause of action is unavailable to Plaintiff because

Plaintiff cannot show that he was an at-will employee.  It is undisputed that Plaintiff had a

contract of employment with MRPC.  Defendants further argue that Plaintiff cannot show that a

substantial factor in MRPC's decision to discharge him was his exercise of protected rights or

his compliance with a clear public policy.  Plaintiff argues in opposition that Defendants have

failed to cite any case for the proposition that common law retaliation is available only to an at-

will employee.  Plaintiff points out that the Tennessee Pattern Jury Instruction on this issue

requires only that a plaintiff show that he was an employee.  As a matter of policy, Plaintiff

argues that there is no reason to limit the availability of this cause of action to an at-will

employee.

The Court finds that Plaintiff has failed to carry his burden as to this claim in so far as

Plaintiff was not an at-will employee.  The Court holds that a claim of common law retaliatory

discharge is available only to an at-will employee, and not a contract employee such as Plaintiff.

This proposition appears to be well-settled under Tennessee law.  The Tennessee courts

construing the common law have consistently listed employment-at-will status as a necessary

element of a claim of retaliatory discharge.[40]  Beginning with *Chism*, many Tennessee courts

have analyzed the common law claim as an exception to Tennessee's doctrine of employment-at-

will.[41]  The *Collins* court's treatment of the issue is representative:

---

[40] *Crews*, 78 S.W.3d at 862; *Stein*, 945 S.W.2d at 716-17; *Reynolds,* 887 S.W.2d at 825; *Anderson,* 857 S.W.2d at 558; *Chism,* 762 S.W.2d at 552.

[41] *Chism*,762 S.W.2d at 557.  *See also e.g. Wooley*, 209 F. Supp. 2d at 845 n. 3; *Guy*, 79 S.W.3d at 535; *Crews*, 78 S.W.3d at 858; *Mason v. Seaton*, 942 S.W.2d 470 (Tenn. 1997); *Conatser v. Clarksville Coca-Cola,* 920 S.W.2d 646 (Tenn. 1995); *Reynolds,* 887 S.W.2d at 825; *Anderson,* 857 S.W.2d at 558; *Hodges v. S.C. Toof & Co.,* 833 S.W.2d 896 (Tenn. 1992);

> Tennessee is an employment at-will state. Accordingly, in the absence of a contract providing otherwise, employers in Tennessee may terminate the employment of at-will employees for any or no cause.  However, the Tennessee Supreme Court has recognized a narrow exception to the employment-at-will doctrine that prevents an employer from terminating the employment of an employee when doing so violates a clearly established public policy which will usually be evidenced by an unambiguous constitutional, statutory, or regulatory provision (citations omitted).[42]

In *Chism*, the Tennessee Supreme Court explained that the retaliatory discharge exception protected even "corporate officers where the latter are not employed for a definite term and have *no formal contract* of employment" (emphasis added).[43]  While the TPPA does protect all employees and guards similar policy interests to the common law tort, the two causes of action are not identical in every respect.  The Tennessee Supreme Court has drawn attention to those differences before and concluded that rather than the statute preempting the common law, the two are cumulative.[44]  In *Guy* the Court noted that the two causes of action have different burdens of proof: the statutory discharge claim requires that the employee's protected activity be the sole factor in his dismissal; whereas, the common law requires only that it be a substantial factor.[45]  Furthermore, the statutory tort is available to both public and private employees while the common law tort is limited only to private employees.[46]  Finally, contrary to Plaintiff's

---

*Clanton v. Cain-Sloan Co.,* 677 S.W.2d 441 (Tenn. 1984).

[42] *Collins*, 241 S.W.3d at 884.  *See also Gossett*, 2009 WL 528924 at *12 ("the philosophy and purpose behind the common-law retaliatory discharge action is to temper the at-will doctrine by restricting an employer's right to discharge an employee in contravention of a well-defined and established public policy") .

[43] *Chism*, 762 S.W.2d at 556.

[44] *Guy*, 79 S.W.3d at 537.

[45] *Id.*

[46] *Id.*

contention, there are at least two other decisions in which courts applying Tennessee common law have ruled that this cause of action is not available to a contract employee.[47]  Because Plaintiff was a contract employee, the Court holds that he cannot make out a prima facie case for this claim.  Therefore, Defendant's Motion is granted as to Plaintiff's common law retaliation claim.

**<u>CONCLUSION</u>**

In light of Plaintiff's notice to Defendant that he has abandoned his federal FCA claim, the Court grants Defendant summary judgment as to that claim.  Furthermore, the Court holds that Plaintiff has failed to carry his burden as to his TPPA claim and Tennessee common law claim for retaliatory discharge.  Therefore, Defendant's Motion is **GRANTED**.


**IT IS SO ORDERED.**

        **s/ S. Thomas Anderson**
        S. THOMAS ANDERSON
        UNITED STATES DISTRICT JUDGE

        Date: July 22nd, 2009.

---

[47] *Conley v. Yellow Freight System, Inc.*, 521 F. Supp. 2d 713, 730-31 (E.D. Tenn. 2007). *See also Guster v. Hamilton County Dept. of Educ.*, 2004 WL 1854181, *38 (E.D. Tenn. 2004).